STEPHANIE M. HINDS (CABN 154284)
United States Attorney

THOMAS A. COLTHURST (CABN 99493)
Chief, Criminal Division

CLAUDIA A. QUIROZ (CABN 254415)
ANDREW F. DAWSON (CABN 264421)
CHRIS KALTSAS (NYBN 5460902)
Assistant United States Attorneys

> 450 Golden Gate Avenue, Box 36055
> San Francisco, California 94102-3495
> Telephone: (415) 436-7428
> FAX: (415) 436-7234
> claudia.quiroz@usdoj.gov

Attorneys for United States of America

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | **CASE NOS. CR 15-0234 CRB; 16-0225 CRB; 19-42 CRB** |
| Plaintiff, | |
| v. | **UNITED STATES' SENTENCING MEMORANDUM FOR PRESCRIPTION DRUG DIVERSION DEFENDANTS** |
| MIHRAN STEPANYAN, ARTUR STEPANYAN, YAN GERMAN, ARMAN ZARGARYAN, LOUI ARTIN, MARC ASHEGHIAN, MICHAEL ASHEGHIAN, ARTUR NAZARYIAN,[1] AND CHERYL BARNDT, | |
| | Sentencing Date: March 21, 2023 |
| | Sentencing Time: 10:00 a.m. |
| | Court: Hon. Charles R. Breyer |
| Defendants. | |

---

[1] Formerly known as Araxia Nazaryian. *See* Dkt. No. 1854 (Stipulation and Order to Amend Superseding Indictment and Change Defendant's Name and Gender Identity).

U.S. SENTENCING MEMORANDUM (PRESCRIPTION DRUG DIVERSION DEFENDANTS)
15-0234 CRB

I

**TABLE OF CONTENTS**

I.  INTRODUCTION ……………………………………………………………………1

II.  DISCUSSION ……………………………………………………………………...1

A.  Background Regarding Wholesale Drug Distribution of Improperly Procured Drugs …..1

B.  Overview of Prescription Drug Diversion Statutory Framework ………………………...2

C.  Overview of Relationship Between Defendants ……………………………………………3

    1.  Artur Stepanyan, Mihran Stepanyan, Yan German, and David Miller ……………….3

    2.  Arman Zargaryan, Artur Nazaryian, Cheryl Barndt, Marc Asheghian, and Michael Asheghian ………………………………………………………………………………4

D.  Analysis of Individual Defendants ……………………………………………………6

    1.  Mihran Stepanyan and Artur Stepanyan ……………………………………………...6

        a.  Summary of Offense Conduct ……………………………………………………6

        b.  Sentencing Guideline Calculation and Guideline Range …………………………8

        c.  JSIN data reflecting sentencing information for similarly situated defendants …..9

        d.  Other factors the Court should consider in imposing a particular sentence …….10

        e.  A Sentence of 136 Months for Mihran Stepanyan and 122 Months for Artur Stepanyan Is Sufficient but Not Greater than Necessary to Achieve the Goals of Sentencing …………………………………………………………………………12

    2.  Yan German (a.k.a., Henrik Harutyunyan) ……………………………………………14

        a.  Summary of Offense Conduct …………………………………………………..14

        b.  Sentencing Guideline Calculation and Guideline Range ………………………..15

        c.  JSIN data reflecting sentencing information for similarly situated defendants….15

        d.  A Sentence of 51 Months for Yan German Is Sufficient but Not Greater than Necessary to Achieve the Goals of Sentencing …………………………………16

    3.  Arman Zargaryan ……………………………………………………………………16

        a.  Summary of Offense Conduct …………………………………………………16

        b.  Sentencing Guideline Calculation and Guideline Range ………………………17

        c.  JSIN data reflecting sentencing information for similarly situated defendants ..18

d.  A Sentence of 78 Months for Arman Zargaryan Is Sufficient but Not Greater than Necessary to Achieve the Goals of Sentencing ……………………………...19

4.  Loui Artin …………………………………………………………………………19

a.  Summary of Offense Conduct …………………………………………………19

b.  Sentencing Guideline Calculation and Guideline Range ………………………20

c.  JSIN data reflecting sentencing information for similarly situated defendants ..21

d.  A Sentence of 27 Months for Loui Artin Is Sufficient but Not Greater than Necessary to Achieve the Goals of Sentencing …………………………………...21

5.  Marc Asheghian and Michael Asheghian ………………………………………...21

a.  Summary of Offense Conduct …………………………………………………21

b.  Sentencing Guideline Calculation and Guideline Range ………………………22

c.  JSIN data reflecting sentencing information for similarly situated defendants ..23

d.  Sentencing recommendation …………………………………………………...23

6.  Artur Nazaryian ………………………………………………………………...23

a.  Summary of Offense Conduct …………………………………………………23

b.  Sentencing Guideline Calculation and Guideline Range ………………………24

c.  JSIN data reflecting sentencing information for similarly situated defendants...24

d.  Sentencing recommendation …………………………………………………...24

7.  Cheryl Barndt …………………………………………………………………...25

a.  Summary of Offense Conduct …………………………………………………25

b.  Sentencing Guideline Calculation and Guideline Range ………………………25

c.  JSIN data reflecting sentencing information for similarly situated defendants...26

d.  Sentencing recommendation …………………………………………………...26

E.  Relative Culpability of the Defendants in this Group ……………………………...26

F.  Comparative Offense Levels ………………………………………………………29

III.   CONCLUSION ……………………………………………………………………...29

1

## **TABLE OF AUTHORITIES**

2

### **Federal Statutes**

3  18 U.S.C. § 2 .................................................................................................................... 23

4  18 U.S.C. § 1962(d) ......................................................................................................... 20

5  21 U.S.C. § 331 ........................................................................................................... passim

6  21 U.S.C. § 353(e)(l)(A) .................................................................................................... 3

7  P.L. 100-293 ........................................................................................................................ 2

8

### **Federal Sentencing Guidelines**

9

U.S.S.G. Ch. 2 .................................................................................................................. 22

10  U.S.S.G. § 2B1.1 ......................................................................................................... passim

11  U.S.S.G. § 3B1.2 .............................................................................................................. 22

12  USSG §2E1.1(a)(1) ........................................................................................................... 20

13  USSG §2N2.1 .................................................................................................................... 20

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

2                                    **INTRODUCTION**

3          Defendants Mihran Stepanyan, Artur Stepanyan, Yan German, Arman Zargaryan, Loui Artin,

4    Marc Asheghian, Michael Asheghian, Artur Nazaryian, and Cheryl Barndt (collectively, "the

5    prescription drug diversion defendants") stand before the Court to be sentenced after pleading guilty to

6    various offenses relating to their conduct in the long-running and sprawling prescription drug diversion

7    scheme charged in the Superseding Indictment.[2]  Pursuant to the Court's Order re: Sentencing, issued on

8    January 30, 2023, this memorandum contains, as to each of the prescription drug diversion defendants,

9    the Sentencing Guideline calculation, the Guideline range, JSIN data reflecting sentencing information

10   for similarly situated defendants, a description of the conduct admitted to by the defendant, the relative

11   culpability of the defendant, any other factors the Court should consider in imposing a particular

12   sentence, and a sentencing recommendation. Dkt. No. 1840.

13                                    **DISCUSSION**

14   **A.      Background Regarding Wholesale Drug Distribution of Improperly Procured Drugs**

15         The wholesale distribution of drugs in the United States and its territories is subject to federal

16   and state regulation. Anyone seeking to engage in the distribution of pharmaceuticals must be licensed

17   in the state and territory in which one does business. Licensing is required in order to ensure that drug

18   distributors procure, handle, and store their drugs in a manner that ensures the drugs' effectiveness and

19   safety. In addition, applicable laws and regulations require drug distributors to maintain strict records on

20   the provenance of the drugs they sell. Such drug "pedigrees" must state, at minimum, from whom the

21   distributor purchased the drugs, and they are intended to allow for the origins of drugs to be readily

22   determined, which is necessary to ensure the effectiveness and safety of the drugs, as well as to facilitate

23   any drug recalls.

24         Except for generic pharmaceuticals, the prices of pharmaceuticals are fairly inelastic. Drug

25

26   _____

27   [2] The sentencing hearings have been divided into two groups—the prescription drug diversion
     group and the tax fraud/treasury check group. Given the overlapping facts between the defendants being
     sentenced on the same date, the government will be filing one sentencing memoranda per group rather
28   than one for each individual defendant.

     U.S. SENTENCING MEMORANDUM (PRESCRIPTION DRUG DIVERSION DEFENDANTS)
     15-0234 CRB
                                          1

1   manufacturers generally set a price, called the "Wholesale Acquisition Cost" ("WAC"), which is the

2   price they charge to wholesalers and other direct accounts before the application of any rebates,

3   discounts, allowances, or other price concessions. Given that many drugs are under patent, and thus, are

4   subject to monopolistic pricing, there is little deviation from the WAC for non-generic drugs.

5        There is, however, a robust black market involving the wholesale distribution of prescription

6   drugs that were procured illicitly at below market (generally, below WAC) value, which are then resold

7   and re-introduced into the market as legitimate drugs at near-market prices.

8        Typically, though not exclusively, illicit procurement involves any of the following: (1) stealing

9   drugs from manufacturers; (2) buying drugs from patients with prescriptions at below-market prices (the

10  patients' costs are offset or reduced by insurance, including Medicare); (3) buying drugs using false

11  prescriptions and straw patients, usually with the aid of a corrupt doctor (again, with the costs offset or

12  reduced by insurance); (4) purchasing drugs from a manufacturer at a discounted price through fraud,

13  e.g., falsely claiming a charitable or similar discount.

14       These "diverted" prescription drugs often are cleaned or repackaged to make them appear

15  legitimate. Their safety and effectiveness, however, are unknown: even if the diverters procure genuine

16  drugs, the diverters often fail to store them properly and mishandle the drugs. In addition, in order to re-

17  introduce these diverted prescription drugs into the legitimate market, the drugs' pedigrees, at some

18  point in the supply chain, must be falsified. The high cost of many of these drugs also provide a

19  compelling financial incentive for criminals to introduce counterfeit or otherwise ineffective pills into

20  the supply chain—which results in multivitamins or over-the-counter medications being found in name-

21  brand prescription drug bottles.

22       **B.       Overview of Prescription Drug Diversion Statutory Framework**

23       Congress enacted the Prescription Drug Marketing Act, P.L. 100-293, 102 Stat. 95 (1988)

24  ("PDMA"), to combat prescription drug diversion. Prescription drug diversion is the practice of

25  purchasing prescription drugs from illegal sources and reintroducing the drugs back into the regulated

26  stream of commerce, where they are ultimately consumed by patients. To ensure that prescription drugs

27  would be safe and effective, and to avoid the unacceptable risk that counterfeit, adulterated, misbranded,

28

sub-potent, or expired drugs would be sold to American consumers, the PDMA added requirements to the Federal Food, Drug, and Cosmetic Act ("FDCA") designed to establish a closed and regulated distribution system for prescription drugs to follow from the manufacturer to the patient.

Two key provisions of the PDMA are relevant to this case: the pedigree requirement and the requirement that wholesale distributors of prescription drugs be licensed by the states in which they operate. A pedigree is a certification that identifies each prior sale, purchase, or trade of a prescription drug, including the date of the transaction and the names and addresses of all parties to the transaction. The FDCA provision requiring a pedigree, 21 U.S.C. § 353(e)(l)(A), is intended to eliminate drug diversion. This pedigree, establishing a chain of custody back to the manufacturer or an Authorized Distributor, provides assurance to other wholesalers, retail pharmacies, and ultimately to all entities on the pharmaceutical supply chain and the consumer, that the drug package contains the correct drug and that it has been handled lawfully and appropriately since it left the manufacturer. It also allows the FDA and other law enforcement to determine the true source of a drug in the event of a problem.

### C.   Overview of Relationship Between Defendants

#### 1.   Artur Stepanyan, Mihran Stepanyan, Yan German, and David Miller

Miller and MIC purchased prescription drugs at deep discounts from a network of illicit and unlicensed drug suppliers. Artur and Mirhan Stepanyan were Miller's biggest suppliers, responsible for more than $150 million in sales to MIC. Miller and MIC sold these drugs to customers throughout the United States. The pedigree documents associated with MIC's sales changed over time, but they were all fraudulent and failed to disclose the true source of the drugs. For most of the period charged in both indictments, the pedigrees stated that MIC had purchased the drugs from one of two Puerto Rican front companies. Miller and MIC paid a commission to the Puerto Rican front companies for allowing MIC to list the companies on the pedigrees. For six months in 2009, MIC did not have a relationship with a Puerto Rican front company. During this period, MIC falsely stated that it had purchased the drugs directly from one of four large drug wholesale companies.

The Stepanyans sold prescription drugs to Miller and MIC in California, even though neither Miller, MIC, nor the Stepanyans were licensed to engage in the wholesale distribution of prescription

drugs in California. Miller and MIC then shipped the drugs to the MIC warehouse in Minnesota and sold the drugs to customers throughout the country.[3]

In 2007 and 2008, the Stepanyans sold prescription drugs to an individual who then sold the drugs to Miller. That individual knew the Stepanyans were not licensed in any state. Starting as early as 2009, the Stepanyans sold tens of millions of dollars in diverted prescription drugs per year to Miller. The Stepanyans incorporated multiple entities in Nevada, including Panda Capital Group, Trans Atlantic Capital Group, and Red Rock Capital Group. From 2009 through early 2012, the Stepanyans used these three corporate names when selling diverted drugs to Miller and MIC. In 2012, the Stepanyans began doing business as GC National Wholesale, the Stepanyans' next corporate entity. Miller's employees continued to deal exclusively with Artur and Mihran, acting on behalf of GC National. Miller paid the Stepanyans more than $160 million for the diverted drugs—typically at prices ranging from 15% to 25% off the Wholesale Acquisition Cost ("WAC") established by manufacturers of prescription drugs.

Artur and Mihran Stepanyan were the largest suppliers of illegally diverted prescription drugs to David Miller. Yan German supplied pharmaceutical drugs to the Stepanyans and helped them launder the illicit proceeds of that scheme. German's suppliers included defendant Ara Karapedyan.

### 2. Arman Zargaryan, Artur Nazaryian, Cheryl Barndt, Marc Asheghian, and Michael Asheghian

In 2012, a group of individuals, including defendants Alexander Soliman and Hugo Marquez, operated a California business called "Apex Pharmaceuticals," which was a licensed California drug wholesaler until November 2011. Eric Figueroa, who pled guilty and has been sentenced,[4] worked for Hugo Marquez. Cheryl Barndt worked for Alexander Soliman. Between March and July 2012, Apex Pharmaceuticals received approximately $14 million from another drug wholesaler, "LLC Wholesale,"[5] in Puerto Rico, for drugs that Apex Pharmaceuticals ostensibly procured from authorized distributors

---

[3] In addition to his purchases from the Stepanyans, Miller purchased prescription drugs from other unlicensed sources in California and Florida.

[4] Figueroa (Total Offense Level 18 / Criminal History Category I) was sentenced to 3 years' probation and six months home detention.

[5] LLC Wholesale was spun off Drogueria De La Villa and was charged with in the District of Puerto Rico with distributing diverted drugs.

1    H.D. Smith and McKesson. In reality, however, the drugs that Apex Pharmaceuticals sold LLC

2    Wholesale had been purchased from the streets by Hugo Marquez, Arman Zargaryan, and an unindicted

3    co-conspirator. The money that LLC Wholesale paid to Apex Pharmaceuticals was then transferred to

4    accounts controlled by Alexander Soliman and his family, and Hugo Marquez.

5         In 2012 and 2013, Alexander Soliman also operated another business called "Maroon

6    Pharmacy," which was not licensed to engage in drug wholesale distribution in California but was

7    licensed in New Mexico. Between November 2012 and May 2013, Maroon Pharmacy received

8    approximately $3.7 million from another drug wholesaler in Puerto Rico, Drogueria De La Villa, for

9    drugs that Maroon Pharmacy ostensibly procured from authorized distributors AmerisourceBergen and

10   Capital Wholesale Drug Co. through "Fox Health Care," a company set up by brothers Marc and

11   Michael Asheghian and other individuals, which was licensed in Utah.[6]  In actuality, however, the drugs

12   that Maroon Pharmacy sold to Drogueria De La Villa had been purchased from the streets by Hugo

13   Marquez and an unindicted co-conspirator, who sent the drugs from Southern California to New Mexico

14   for eventual delivery to Drogueria De La Villa. Maroon Pharmacy sent money to Fox Health Care to

15   make it appear it purchased drugs from Fox Health Care, when, in reality, the Asheghians simply

16   returned some of the money to Marquez.[7]  Ultimately, the money that Maroon Pharmacy received from

17   selling drugs to Drogueria De La Villa was transferred to accounts controlled by Marquez, by Soliman,

18   and by someone called "Ara Yeramyan," who was the authorized signor for bank accounts maintained

19   under the name "Nuvo Pharmaceuticals" – a company operated by Arman Zargaryan – and "AAA."

20   Bank video surveillance shows that Artur Nazaryian, who worked for Zargaryan, made withdrawals

21   from the Yeramyan-Nuvo Pharmaceuticals accounts.

22        With respect to Fox Health Care in particular, Maroon Pharmacy in March and June 2014

23   transferred a total of $24,014 to Marc Asheghian directly. Then from July 2013 through January 2015,

24   _____

25        [6] According to e-mails of Cheryl Barndt, who worked at both Apex Pharmaceuticals and Maroon
     Pharmacy, and bank records, Apex Pharmaceuticals sold its drug inventory to LLC Wholesale, while
26   Maroon Pharmacy sold its drug inventory to Drogueria De La Villa.

27        [7] Bank records confirm that Maroon Pharmacy paid Hugo Marquez, Arman Zargaryan (through
     his company Nuvo Pharmaceuticals), and "Fox Health Care." Fox Health Care transferred much of this
28   money back to Marquez, corroborating the conclusion that Marquez and Zargaryan supplied Maroon
     Pharmacy, and that Fox Health Care was used as a front.

U.S. SENTENCING MEMORANDUM (PRESCRIPTION DRUG DIVERSION DEFENDANTS)
15-0234 CRB

Maroon Pharmacy transferred $3,001,752 to Fox Health Care. From August to January 2015, Fox Health Care transferred $1,339,591 back to an account controlled by Hugo Marquez, while from November 2014 through January 2015, Fox Health Care transferred $486,137 to a bank account controlled by someone named "Ramin Rzayev, d/b/a BLW Distributors."  The money sent to Ramin Rzayev was then liquidated via cash withdrawals at ATMs or through checks negotiated at check cashing businesses. Thea Fox, an employee of Fox Health Care in Utah, told a state inspector that Fox Health Care has no drug business and never had any inventory, as far as she knew. Similarly, the nominal owner of Fox Health Care, Ron Culler, was also interviewed, and he reported that had been asked to become the owner of Fox Health Care by Marc Asheghian.

In 2013, defendants Hugo Marquez and two unindicted co-conspirators operated a company called ME Wholesale Distribution LLC ("ME Wholesale"), which was not licensed to engage in wholesale drug distribution in California but was licensed in Pennsylvania. Between May and August 2013, ME Wholesale received approximately $7.4 million from LLC Wholesale for drugs sold by ME Wholesale that ME Wholesale reported had been supplied by Arman Zargaryan's Nuvo Pharmaceuticals.[8]  Nuvo Pharmaceuticals, in turn, claimed to have received the drugs from McKesson, as well as claimed to have been an authorized distributor for various drug manufacturers. In actuality, the drugs that ME Wholesale sold to LLC Wholesale were purchased from the streets. In addition, the money that LLC Wholesale paid to ME Wholesale was transferred to bank accounts under the name Nuvo Pharmaceuticals, AAA, and other names. As stated above, bank video surveillance indicates that Artur Nazaryian withdrew more than $2 million from these accounts.

    **D.**    **Analysis of Individual Defendants**

        **1.**  **Mihran Stepanyan and Artur Stepanyan**

            **a.**    **Summary of Offense Conduct**

As stated above and described in detail in their respective plea agreements, the Stepanyans were engaged in a massive drug diversion and money laundering scheme that lasted several years. Banking

---

[8] From roughly December 2012 to May 2014, Maroon Pharmacy transferred approximately $3,784,126 to a Nuvo Pharmaceuticals Pharmacy account. Nuvo Pharmaceuticals, of course, was controlled by Arman Zargaryan.

records and electronic correspondence show that the Stepanyans, who were cousins and were two

significant figures in Armenian organized crime in Southern California, controlled an entity called GC

National Wholesale and numerous other entities and bank accounts through which roughly $157 million

of pharmaceutical money flowed between January 2010 through mid-March 2014. At least one of these

accounts had been opened under false identities.

The bank records also showed that the Stepanyans received almost all their money from MIC

and Miller.[9]  MIC and Miller bought diverted prescription drugs from the Stepanyans and then claimed

that the drugs had been supplied by other companies. MIC stored its (false) drug pedigrees through an

Internet service provider in the Northern District of California for their customers to download.

The Stepanyans also used other entities to launder money into gold. Following a transfer of the

$7,824,000 from MIC to Sky Atlantic, the Sky Atlantic account transferred $8,100,000 to a Citibank

account maintained under the name "Westprime Systems" between August 21 to November 19, 2014.

The money from this account was then transferred to yet another account maintained under the name

"Nationwide Payment Solutions."  According to bank records, from October 22 to November 18, 2014,

the Nationwide Payment Solutions account wired $5,509,000 to a Los Angeles gold trader, AAPS

Bullion, which was used to buy "gold shot." AAPS Bullion employees recognized this customer only as

"Gary."

Pursuant to plea agreements with the government, both Mihran and Artur pled guilty to Count

One of the Second Superseding Indictment charging them with RICO conspiracy.[10]  The plea

agreements reflect the Stepanyans' distinct roles and respective involvement in the scheme. Both

defendants have agreed to admit to a thorough and detailed set of facts in paragraph 2 of the plea

---

[9] Miller had previously been indicted for prescription drug diversion in the Central District of California, where the charges were dismissed due to Speedy Trial issues.

[10] On May 6, 2015, an indictment was filed in the Southern District of Ohio against David Miller, the Stepanyans, and Miller's company, Minnesota Independent Cooperative ("MIC"). That case was eventually transferred to the Northern District of California and handled in parallel with the instant action. *See* Case no. CR-16-226-CRB. As set forth in the Stepanyans' plea agreements, the government agreed "to dismiss the charges against the [Stepanyans] in the matter of *United States v. David Miller et al*, Case No. CR-16-00225-CRB, which has been consolidated with this case."  *See* Plea Agreements ¶ 15.

agreement. Specifically, Mihran and Artur Stepanyan admitted to detailed facts relating to their scheme as well as a loss amount of approximately $200 million, which represents the amount of diverted pharmaceuticals they sold to Miller, many of which were HIV drugs. In addition, they laundered the money they received from Miller for the drugs through numerous bank accounts they established in the names of various shell companies they set up to further their scheme. Although the Stepanyans worked together in the scheme, they played different roles: Artur was mainly responsible for the relationship with Miller and MIC and coordinated the sale of drugs. Mihran, on the other hand, was responsible for setting up the bank accounts and laundering the proceeds. In 2010, Artur was involved in a car accident that left him in a coma and in rehabilitation for most of that year but resumed his illicit activities following his recovery. Mihran continued operating the scheme the entire time and was involved in additional conduct that did not involve Artur.

**b.    Sentencing Guideline Calculation and Guideline Range**

The Guideline calculations for Mihran and Artur Stepanyan are as follow:

a.    Pursuant to U.S.S.G. § 2E1.1(a), the base offense level for Count One is the greater of either 19 or the offense level applicable to the underlying racketeering activity.

b.    The underlying racketeering activity in Count One involves, among other activity, conspiracies to commit identity theft and bank fraud. The offense level applicable to this activity is 33 because the loss amount is greater than $150,000,000 but less than $250,000,000. *See* U.S.S.G § 2B1.1(a)(1) and (b)(1)(N). Because the offense level for the underlying racketeering activity is greater than the offense level under U.S.S.G. § 2E1.1(a), the total offense level is 33.

c.     Acceptance of Responsibility:                                                  - 3

d.    Adjusted Offense Level:                                                              30

With a Criminal History Category of III and an adjusted offense level of 30, the Guidelines range for Mihran Stepanyan is 121 to 151 months.

With a Criminal History Category of II and an adjusted offense level of 30, the Guidelines range for Artur Stepanyan is 108 to 135 months.

Mihran admits that he is responsible for a loss amount of $199M. Artur admits to the same conduct, but states in his plea agreement that Mihran was the one who controlled and managed the bank

accounts and bought gold to launder the proceeds of their drug sales. Indeed, Artur contends that given his role in the scheme compared to Mihran, he should be held responsible for no more than $150M. Because the parties were unable to reconcile these divergent positions during negotiations, the plea agreement for Artur contains two competing adjusted offense levels (30 and 28), which are based on two distinct loss amounts under U.S.S.G. § 2B1.1(b)(1).

The evidence of the Stepanyans' sprawling scheme is overwhelming and corroborated by their detailed admissions. That they each played a different role within their scheme is consistent with a criminal conspiracy and enterprise. Both were involved at a massive scale, and each played a key role to further the scheme as a whole. For these reasons, it is the government's position is that Artur and Mihran should be held responsible for the same loss amount.

### c.    JSIN data reflecting sentencing information for similarly situated defendants

Artur Stepanyan. According to Judiciary Sentencing Information (JSIN) data, during the last five fiscal years (FY2017-2021), there were 10 defendants whose primary guideline was §2B1.1, with a Final Offense Level of 30 and a Criminal History Category of II, after excluding defendants who received a §5K1.1 substantial assistance departure. For the 10 defendants (100%) who received a sentence of imprisonment in whole or in part, the average length of imprisonment imposed was 96 month(s) and the median length of imprisonment imposed was 89 month(s). For all 10 defendants in the cell, the average sentence imposed was 96 month(s) and the median sentence imposed was 89 month(s).

Mihran Stepanyan. During the same time period, there were 10 defendants whose primary guideline was §2B1.1, with a Final Offense Level of 30 and a Criminal History Category of III, after excluding defendants who received a §5K1.1 substantial assistance departure. For the 9 defendants (90%) who received a sentence of imprisonment in whole or in part, the average length of imprisonment imposed was 102 month(s) and the median length of imprisonment imposed was 108 month(s). For all 10 defendants in the cell, the average sentence imposed was 93 month(s) and the median sentence imposed was 97 month(s).

In addition, a review of certain specific sentences imposed in similar cases demonstrate the

wide range of custodial sentences imposed in large-dollar fraud cases.  While each case is different, there is precedent for Courts to impose significant custodial sentences in white collar cases.

| Defendant | Case No. | Approximate Loss Amount | Sentence |
|---|---|---|---|
| Charles W. McCall (McKesson-HBOC Chairman of the Board) | CR-505 WHA (N.D. Cal.) | $8.6 billion | 120 months (no cooperation) |
| Walter A. Forbes (Cendant CEO) | CR-264 AHN Conn.) | More than $1 billion | 151 months (no cooperation) |
| Timothy J. Rigas (Adelphia CFO) | CR-1236 LBS (S.D.N.Y) | More than $100 million | 204 months (no cooperation) |
| John Rigas (Adelphia CEO) | 02-CR-1236 LBS (S.D.N.Y) | More than $100 million | 144 months (no cooperation) |
| Bernard J. Ebbers (WorldCom CEO) | 02-CR-1144 BSJ (S.D.N.Y) | More than $1 billion | 300 months (no cooperation) |
| Sanjay Kumar (Computer Associates CEO) | 04-CR-846 ILG (E.D.N.Y.) | More than $400 million | 144 months (no cooperation) |
| Jeffrey K. Skilling (Enron CEO) | 04-CR-025 (S.D. Tex.) | More than $80 million | 168 months (no cooperation) |
| Samuel "Mouli" Cohen | 10-CR-547 CRB (N.D. Cal.) | $31 million | 264 months (no cooperation) |
| Ebrahim Shabudin (United Commercial Bank Chief Credit Officer) | 11-CR-664 JSW (N.D. Cal) | $677 million | 97 months (no cooperation) |
| John Geringer | 12-CR-888 EJD (N.D. Cal) | Approx. $45 million | 140 months (with cooperation) |
| Christopher Luck | 12-CR-888 EJD (N.D. Cal) | Approx. $45 million | 130 months (no cooperation) |
| Sean Clark Cutting (Sonoma Valley Bank CEO) | 14-CR-139 SI (N.D. Cal) | $47 million | 100 months (no cooperation) |

> **d.    Other factors the Court should consider in imposing a particular sentence**

During David Miller's trial, the government introduced witness testimony that illustrates the extent of the Stepanyans' criminal conduct in this case. For instance, with respect to the entity called Panda Capital Group referenced above, the Stepanyans created it by using Witness-1. The Stepanyans

approached this individual, a Syrian immigrant with a high school education who worked as a cashier at a liquor store (where he met Artur Stepanyan). Artur, who Witness-1 believed was a pharmacist, befriended Witness-1 and later introduced him to Artur's family, including his cousin Mihran. Over the first few months of their acquaintance the Stepanyans took a keen interest in Witness-1's life and, after some time, offered to help Witness-1 by setting up an electronics company together. The Stepanyans led Witness-1 to believe that he would be the owner of the company and that the Stepanyans would supply the money or invest to buy products. They told Witness-1 that they would create a corporation and would have Witness-1 sign the paperwork so that it could be in his name (the Stepanyans reportedly could not have their names on the company because they were not citizens). The name of the corporation would be Panda Capital Group.

They told Witness-1 to go to an office in Tustin, California where he would meet with the attorney that would be handling the paperwork. That attorney was David Miller. After signing the paperwork, Artur Stepanyan instructed Witness-1 to open bank accounts so that he could have credit line. Witness-1 had no prior business experience in terms of owning a business, so this did not strike him as unusual. After Witness-1 gave the Stepanyans the bank account information, those accounts started receiving large amounts of cash (approximately $200,000, which came from one of David Miller's companies) and Artur then asked him to transfer the money to other accounts. When Witness-1 realized that this was not legitimate and that he was already in trouble anyway, he took the money out of the account, and fled to the Bay Area with a plan to leave the country. The Stepanyans then started contacting Witness-1's family and friends and made threats against them if Witness-1 did not return with the money. Witness-1 then returned to Southern California because he was scared. He met with Artur Stepanyan who demanded the return of the money. Witness-1 returned part of it but had spent some that he was unable to return. They came to the agreement that Witness-1 would work off his debt and would write off $3,000 per month, which would be his salary (and which would take about two years to pay off). To prevent Witness-1 from fleeing, the Stepanyans took his passports, as well as the passports of his wife and daughter. The Stepanyans directed Witness-1 to stay close to them. Witness-1 continue doing work at the Stepanyans' instruction, signing checks, and making account transfers for

Panda. Witness-1 continued doing this work for the Stepanyans for approximately four months and in December he took off and fled to Syria.

In addition, the testimony of Witness-2 shed light into the extent of the Stepanyans' massive and sophisticated money laundering scheme. For approximately a two-year period starting in 2012, Witness-2 laundered—for the Stepanyans and at their direction—over $36.5 million dollars, which represented proceeds of the illicit prescription drug diversion scheme. Witness-2 created fake identities and sham companies which he used to receive large and frequent wire transfers from the Stepanyans and David Miller's entities, which he was directed to withdraw from the bank in cash. Witness-2 was able to do this without alerting the bank by working with an insider, a bank manager, who was paid a percentage of the withdrawals as a fee to ensure that the transactions were not flagged. To highlight the amount of money the Stepanyans laundered using just this co-conspirator, Witness-1 and his crew would walk into a Wells Fargo branch two to three times a week for a two-year period and walked out with suitcases containing $100,000 to $150,000 in cash, which he would deliver to the Stepanyans.

   **e. A Sentence of 136 Months for Mihran Stepanyan and 122 Months for Artur Stepanyan Is Sufficient but Not Greater than Necessary to Achieve the Goals of Sentencing**

The government recommends a sentence at the middle of the applicable of the Sentencing Guidelines range for both Mihran and Artur Stepanyan.

The two most culpable defendants in this group are the Stepanyans. They were largely responsible for injecting nearly $200 million dollars' worth of diverted pharmaceuticals into pharmacies across the United States. Those pharmaceuticals, which were—as the evidence in trial established—sourced from places like Ara Karapedyan's pizza shop and other street sources, were sold to pharmacies and their patients under the pretext that the pharmaceuticals were safe, effective, and supplied via the regulated supply chain. But those pharmaceuticals were not sold through the regulated pipeline, and indeed, some of the drugs that Miller and MIC sold to pharmacies were not what they claimed to be. Although there is no way to attribute specific bottles of drugs to what the Stepanyans sold to Miller and MIC, the evidence shows that the Stepanyans were providing Miller and MIC with the vast majority of the drugs they sold to pharmacies, at least by volume and value of sales.

The evidence further indicates that the Stepanyans brazenly disregarded regulations meant to keep patients safe, as well as attempts by law enforcement to investigate their conduct. For example, at trial, a witness testified that law enforcement sought entry into Niva Pharmaceuticals, a shell entity the Stepanyans used to sell diverted drugs to Miller and MIC. To that point, the Stepanyans used Niva Pharmaceuticals merely as a place to hold their diverted drugs, perform perfunctory examinations on the drugs, and then have a MIC employee ship the drugs from the Los Angeles area to MIC's warehouse in Minnesota. In autumn 2014, however, law enforcement knocked on the door of the Niva Pharmaceuticals building, at which point Artur Stepanyan told his employee not to open the door. The Stepanyans and the employee waited for hours before moving their operations elsewhere and abandoning Niva's physical location. Once they no longer had the space that Niva provided, the Stepanyans returned to old ways—hawking pharmaceuticals to Miller and MIC from their homes, where they also stored the drugs that patients would end up taking.

The Stepanyans worked closely with Miller to ensure that their illicit activity would be well hidden from law enforcement authorities. Between using several shell entities with headquarters in various states; opening entities and bank accounts using false identities; attempting to have unwitting third persons open bank accounts and entities in their names and paying them to manage the Stepanyans' illicit profits; and liquidating their profits into cash and gold, again using false identities as well as couriers and professional money launderers, the Stepanyans worked tirelessly to shield their operation from law enforcement activity.

The extent of the Stepanyans' criminal activities counsels in favor of a sentence firmly within the higher end of the Guidelines range. The nature of their offense conduct is extraordinary and serious. Their illicit conduct resulted in nearly $200 million in profits from the sale of diverted pharmaceuticals, all of which they knew would be marketed to pharmacies and, ultimately, patients who relied on these drugs to treat various conditions. Those drugs treated serious conditions ranging from psychiatric illnesses; high blood pressure; diabetes; hepatitis; and HIV, among others.

A Guidelines sentence would also achieve other aims outlined in Title 18, United States Code, Section 3553, including deterring the Stepanyans from selling diverted pharmaceuticals again, and to

deter others from engaging in the same conduct. The available evidence indicates that the Stepanyans' conduct included not just their own sales of diverted pharmaceuticals to Miller and MIC, but an entire money laundering apparatus designed to assist them in liquidating the prodigious profits they rendered from Miller, MIC, and, by extension, unwitting pharmacists and patients. The individuals involved in the Enterprise included those working with banks to obtain large sums of cash; Yan German, who both obtained drugs and assisted with laundering those proceeds into gold; Ara Karapedyan, who used his connection to the check cashing scheme to obtain money for the Stepanyans; and others. A Guidelines sentence would help deter any individual from diverting pharmaceuticals or assisting with such an endeavor and would not be more than necessary to advance the goals set forth in Title 18, United States Code, Section 3553.

### 2. Yan German (a.k.a., Henrik Harutyunyan)

#### a.     Summary of Offense Conduct

German pled guilty to Count One of the Second Superseding Indictment, RICO conspiracy pursuant with a plea agreement with the government.

As noted above, the Stepanyans controlled GC National Wholesale. Bank accounts in the name of GC National were opened in February 2012, with a signer of George Cardashian ("Cardashian Identity"). Agents determined that this Cardashian Identity was a false identity. In August 2013, Ara Karapedyan gave the FBI undercover agent a false nightclub investment agreement, which was signed using the false "George Cardashian" identity. That agreement had Yan German's fingerprints on it. The purpose of that agreement was to provide cover for illicit wire payments coming from GC National (i.e., the Stepanyans) for the diverted prescription drugs that Karapedyan sold to Yan German (and the Stepanyans, which eventually made their way to David Miller.)  The agreement falsely represented that the money was associated with a nightclub investment.

German has admitted his conduct as one of the suppliers of pharmaceutical drugs for the Stepanyans. He also admitted his involvement in wire fraud and money laundering as part of the RICO enterprise as well as his involvement in a separate prescription drug diversion and check cashing scheme with Ara Karapedyan. Although he admitted that he is responsible for a loss amount of at least

$3,613,376, which corresponds to the specific amounts listed in the factual basis, he understands that he could also be held responsible for the number of pharmaceutical drugs the Stepanyans sold to Miller during the time he was their supplier (approximately $98 million). Recognizing that the government is able to prove a higher loss amount (but unable to quantify it based on personal knowledge), German has agreed that the appropriate loss amount for calculation of the offense level is between $9.5 and $25 million.

**b.     Sentencing Guideline Calculation and Guideline Range**

As set forth in the plea agreement, German's Guidelines calculation is as follows:

a.   Pursuant to U.S.S.G. § 2E1.1(a), the base offense level for Count One is the greater of either 19 or the offense level applicable to the underlying racketeering activity.

b.   The underlying racketeering activity in Count One involves, among other activity, conspiracies to commit identity theft and bank fraud. The offense level applicable to this activity is 23 because the loss amount is greater than $$9,500,000 but less than $25,000,000. *See* U.S.S.G § 2B1.1(a)(1) and (b)(1)(K). Because the offense level for the underlying racketeering activity is greater than the offense level under U.S.S.G. § 2E1.1(a), the total offense level is 27.

c.    Acceptance of Responsibility:                                                    - 3

d.    Adjusted Offense Level:                                                           24

German's adjusted offense level is 24 and with a Criminal History Category of I, his Guidelines Range is 51 to 63 months.

**c.     JSIN data reflecting sentencing information for similarly situated defendants**

During the last five fiscal years (FY2017-2021), there were 401 defendants whose primary guideline was §2B1.1, with a Final Offense Level of 24 and a Criminal History Category of I, after excluding defendants who received a §5K1.1 substantial assistance departure. For the 391 defendants (98%) who received a sentence of imprisonment in whole or in part, the average length of imprisonment imposed was 41 month(s) and the median length of imprisonment imposed was 42 month(s). For all 401 defendants in the cell, the average sentence imposed was 40 month(s) and the median sentence imposed was 42 month(s).

### d.    A Sentence of 51 Months for Yan German Is Sufficient but Not Greater than Necessary to Achieve the Goals of Sentencing

In light of his conduct and taking into consideration the factors laid out in the PSR, including this defendant's background and history, his characteristics, his role in the offense, and others, a sentence at the low end of the applicable Guidelines range is a fair sentence for this defendant.

### 3.    Arman Zargaryan

### a.    Summary of Offense Conduct

Although Zargaryan's involvement was mainly on the diverted drug distribution side, he was also involved in check fraud. A detailed recitation of his conduct is laid out in paragraph 2 of the plea agreement. In summary:

<u>Involvement in Distribution of Diverted Prescription Drugs</u>

Zargayan operated a California-licensed drug wholesale company, Nuvo Pharmaceuticals, which had originally been created by Arman Danielian. Zargaryan and an unindicted co-conspirator used Nuvo Pharmaceuticals as a front for the drugs that a company called ME Wholesale sold to LLC Wholesale from May to August 2013. Nuvo Pharmaceuticals was licensed in California, but it did not actually supply the drugs that ME Wholesale sold. In addition, the pedigrees for ME Wholesale's drugs not only claimed that it received the drugs from Nuvo Pharmaceuticals, they also claimed that Nuvo Pharmaceuticals had received the drugs from McKesson. This was false. A McKesson official contradicted this claim and reported that McKesson has never dealt with Nuvo Pharmaceuticals.

More specifically, between May and August 2013, ME Wholesale received approximately $7.4 million from LLC Wholesale for drugs sold by ME Wholesale that ME Wholesale reported had been supplied by Zargaryan's Nuvo Pharmaceuticals. Nuvo Pharmaceuticals, in turn, claimed to have received the drugs from McKesson, as well as claimed to have been an authorized distributor for various drug manufacturers. In actuality, the drugs that ME Wholesale sold to LLC Wholesale were purchased from the streets. In addition, the money that LLC Wholesale paid to ME Wholesale was transferred to bank accounts under the name Nuvo Pharmaceuticals, AAA, and other names. Bank video surveillance indicates that Artur Nazaryian withdrew more than $2 million from these accounts.

As noted above, after Zargaryan learned that Nazaryian had been interviewed by the FBI, he arranged to hire a lawyer, Fred Minassian (currently awaiting trial in the Central District of California for criminal activity related to drug diversion) who would make sure that Nazaryian would not cooperate with the FBI, and who would provide updates to Zargaryan about the status of Nazaryian's case. Zargaryian collected funds from other co-conspirators to pay for Nazaryian's attorney so that they would all be protected. Nazaryian provided no additional interviews to the FBI.

From roughly December 2012 to May 2014, Maroon Pharmacy transferred approximately $3,784,126 to a Nuvo Pharmaceuticals Pharmacy account. Nuvo Pharmaceuticals, of course, was controlled by Zargaryan.

Involvement in Check Fraud

In 2013, defendant Michael Inman stole several high-value cashier's checks from a woman (Luisa Castro) which Zargaryan and Dmitriy Kustov used to fund a bank account created under the woman's name from which they wrote checks.[11]  More specifically, on or about June 25, 2013, Zargaryan provided a confidential source in this case a single check for $57,000 that was drawn on an account of "Luisa Castro."  Over the next few weeks, Kustov provided the confidential source additional checks also drawn on the Luisa Castro account.

Zargaryan is a self-proclaimed founding member of the Armenian Power Street gang. In addition, there is evidence that he has extorted individuals for diverted prescription drug debts. More specifically, over a period of six to seven months, Zargaryan repeatedly called an individual and demanded payment. Zargaryan said that he would "put two feet in one sack," which was understood to be a threat of violence.

**b.    Sentencing Guideline Calculation and Guideline Range**

Pursuant to the plea agreement, Zargaryan pled guilty to Count One – Racketeering Conspiracy. This is an 11(c)(1)(B) agreement that allows Zargaryan to argue for a loss amount of $2.2 million, which represents the outstanding debt to him for diverted prescription drugs he had supplied to Apex

---

[11] Defendants Dmitriy Kustov and Michael Inman, both of whom have already been sentenced in this matter, were associates of Zargaryan. Inman stole checks that were ultimately used to fund a bank account from which Zargaryan and Kustov tried to withdraw money.

Pharmaceuticals. The proposed plea agreement sets out a competing guideline range based on differing

loss amounts. The defendant will be allowed to argue for that loss amount at sentencing. More

specifically, he would be arguing for a 16-level increase based on loss that is more than $1,500,000 but

less than $3,500,000. See U.S.S.G. 2B1.1(b)(1)(I). Conversely, the government argues for a loss amount

consistent with all his conduct, which would result in a 22-level increase based on loss higher than

$25,000,000 but less than $65,000,000. See U.S.S.G. 2B1.1(b)(1)(L). For the defendant, this results in

an adjusted offense level of 20 and the government would argue for an adjusted offense level of 26.

    a.    Pursuant to U.S.S.G. § 2E1.1(a), the base offense level for Count One is the greater of either 19 or the offense level applicable to the underlying racketeering activity.

    b.    The underlying racketeering activity in Count One involves, among other activity, conspiracies to commit identity theft and bank fraud. The offense level applicable to this activity is 23 because the loss amount is greater than $25,000,000 but less than $65,000,000. *See* U.S.S.G § 2B1.1(a)(1) and (b)(1)(L). Because the offense level for the underlying racketeering activity is greater than the offense level under U.S.S.G. § 2E1.1(a), the total offense level is 29.

    c.    Acceptance of Responsibility:        - 3

    d.    Adjusted Offense Level:        26

    With a criminal history of III, an adjusted offense level of 26 results in a Guideline range of 78 to

97 months.

### c.   JSIN data reflecting sentencing information for similarly situated defendants

During the last five fiscal years (FY2017-2021), there were 25 defendants whose primary

guideline was §2B1.1, with a Final Offense Level of 26 and a Criminal History Category of III, after

excluding defendants who received a §5K1.1 substantial assistance departure. For the 25 defendants

(100%) who received a sentence of imprisonment in whole or in part, the average length of

imprisonment imposed was 72 month(s) and the median length of imprisonment imposed was 78

month(s). For all 25 defendants in the cell, the average sentence imposed was 72 month(s) and the

median sentence imposed was 78 month(s).

### d.   A Sentence of 78 Months for Arman Zargaryan Is Sufficient but Not Greater than Necessary to Achieve the Goals of Sentencing

Zargaryan was involved in a racketeering conspiracy which primarily focused on collecting drugs from unlicensed sources and creating false and fraudulent paperwork to make it appear that those drugs had been purchased from legitimate sources. He supplied diverted pharmaceutical drugs and operated a company which was used as a front for drugs to be sold to other entities. He, along with his co-defendants, were responsible for selling over $24 million worth of improperly procured drugs. He was also a part of an agreement to commit bank fraud. Zargaryan's and his co-defendants' actions show a disregard for the health and safety of the consumers of the diverted drugs. Additionally, during the time the instant offense occurred, the defendant also committed another federal offense for which he was convicted in 2014.

For the reasons set forth herein and the factors laid out in the PSR, a sentence of 78 months is sufficient, but not greater than necessary to achieve the goals of sentencing for this defendant.

### 4. Loui Artin

#### a. Summary of Offense Conduct

Artin's criminal conduct was centered on his role in allowing Karapedyan and the Stepanyans to launder money through at least two accounts he controlled. Artin mostly used these accounts for his own legitimate businesses, but between 2012 and 2014, Artin also used them to launder drug diversion money for Karapedyan, the Stepanyans, and co-defendant Khachig Geuydjian. In total, Artin laundered approximately $431,719 for the drug diversion conspiracy. When compared to the hundreds of millions of dollars flowing through the drug diversion conspiracy, Artin's conduct might not look severe, but in the government's view, he played an integral role. Thus, he should not be awarded the two-point reduction for acceptance of responsibility.

The Stepanyans used others to facilitate the conversion of the proceeds of their involvement in the diverted pharmaceuticals scheme into cash. Artin was one such channel. The Stepanyans enlisted Artin to convert over $430,000 of proceeds in the GC National account into cash by transferring those funds into a bank account held in the name of "MJ Trade Group." Artin PSR ¶ 46. After the proceeds were transferred into the MJ Trade Group, Artin transferred those proceeds into bank accounts held in his name and in the name of "Art Man," before the proceeds were ultimately provided to the

Stepanyans. *Id.* While under supervision for this conduct, Artin provided another individual with over 120 bottles of prescription drugs, knowing that he did not have a license to distribute those drugs in California. Artin PSR ¶¶ 48-49. Artin was on pretrial release and under supervision when he engaged in this conduct. Artin PSR ¶ 50.

**b.      Sentencing Guideline Calculation and Guideline Range**

Count One: Racketeering Conspiracy

a.      The guideline for a violation of 18 U.S.C. § 1962(d) is USSG §2E1.1. Pursuant to this guideline, the Base Offense Level is the greater of either 19 or the offense level applicable to the underlying racketeering activity. The underlying racketeering activity in Count One involved, among other activity, conspiracies to commit identity theft and bank fraud. The offense level applicable to this activity is 19 because the loss amount is greater than $250,000 but less than $550,000. As such, the base offense level is 19. USSG §2E1.1(a)(1) and USSG §2B1.1(b)(1)(G).

Count Two:  Unlicensed Wholesale Distribution of Prescription Drugs

b.      Base Offense Level: The guideline for a violation of 21 U.S.C. § 331(t) is USSG §2N2.1. Pursuant to the cross reference at §2N2.1(c)(1), 2B1.1 is used to determine the offense level because it results in a higher offense level. The base offense level is 6 as the statutory maximum penalty is less than 20 years imprisonment. USSG §§2B1.1(a)(2) and 2N2.1(c)(1).

c.      Specific Offense Characteristics: As a result of the defendant's conduct, a loss of $11,920 is attributed to the the defendant, which represents the estimated wholesale cost of prescription drugs.

d.      Adjusted Offense Level is 8

e.      Greater of adjusted offense level:  19 (The Combined Adjusted Offense Level is determined by taking the offense level applicable to the Group with the highest offense level and increasing the offense level by the amount indicated in the table at USSG §3D1.4.)

f.       Acceptance of Responsibility:                                              - 3

g.      Total Offense Level:                                                            16

**c.      JSIN data reflecting sentencing information for similarly situated defendants**

During the last five fiscal years (FY2017-2021), there were 25 defendants whose primary guideline was §2E1.1, with a Final Offense Level of 16 and a Criminal History Category of II, after excluding defendants who received a §5K1.1 substantial assistance departure. For the 24 defendants

(96%) who received a sentence of imprisonment in whole or in part, the average length of imprisonment imposed was 20 month(s) and the median length of imprisonment imposed was 24 month(s).

### d.   A Sentence of 27 Months for Loui Artin Is Sufficient but Not Greater than Necessary to Achieve the Goals of Sentencing

The government agrees with U.S. Probation's recommended sentence as to Artin. A Guidelines sentence reflects the special need to deter Artin from engaging in criminal activity because, while on pretrial release for conduct related to laundering the proceeds of crime for the Stepanyans, he was arrested for engaging in the diversion of pharmaceuticals on his own. Notwithstanding this Court's various admonishments and set conditions, Artin engaged in arguably more egregious conduct that was related to the conduct for which he was arrested. A sentence in the Guidelines range would reflect the circumstances of Artin and his offense, including his decision to engage in more egregious conduct while on pretrial supervision. It would also have a strong deterrent effect on Artin and others who may support individuals like the Stepanyans before they branch off and attempt to commit more crimes while on supervision. The sentence that U.S. Probation recommended, to wit, 27 months' imprisonment, is sufficient, but no more than necessary, to ensure that the goals articulated in Title 18, United States Code, Section 3553 are met. Moreover, this sentence reflects that Artin is less culpable than either Zargaryan or German; although he did engage in drug diversion, he diverted fewer drugs than other defendants in this case. He also laundered funds, but at a lesser scale than other defendants in this case. A mid-Guidelines sentence reflects the severity of his conduct while also reflecting his relative culpability to the other defendants in this matter.

### 5. Marc Asheghian and Michael Asheghian

### a.   Summary of Offense Conduct

The Ashegians were involved in the creation and management of an entity known as "Fox Health Care" ("FHC") in 2014. Marc Ashegian PSR ¶ 50; Michael Ashegian PSR ¶ 48. FHC was a pharmaceutical wholesaler licensed in Utah and opened in Marc Ashegian's name. Marc Ashegian PSR ¶ 50. Although the Ashegians purportedly believed that FHC would be selling drugs it purchased from legitimate, licensed pharmaceutical wholesalers, FHC was essentially shell company through which

Maroon Pharma sold diverted prescription drugs. Marc Ashegian PSR ¶ 51; Michael Ashegian PSR ¶ 49. The Ashegians knew that, despite operating in California, Maroon Pharma had no license to distribute wholesale pharmaceuticals in California (though Maroon Pharma did have a license wholesale pharmaceuticals in New Mexico). Marc Ashegian PSR ¶ 51; Michael Ashegian PSR ¶ 49. The Ashegians also knew that FHC did not have pharmaceuticals on site to support its purported sales; although FHC made a single purchase of drugs from a legitimate wholesaling company totaling $7,500 in September 2014, FHC made no other purchases from legitimate wholesalers. Marc Ashegian PSR ¶ 52; Michael Ashegian PSR ¶ 50. Instead, FHC sold diverted pharmaceuticals to Maroon Pharma and claimed, through pedigrees, that it had purchased those drugs from legitimate sources; in reality, those drugs were sourced from the streets. Marc Ashegian PSR ¶ 52; Michael Ashegian PSR ¶ 50.

The Ashegians were aware that FHC did not sell pharmaceuticals it purchased from legitimate wholesalers because their business records never indicated that FHC made payments to legitimate wholesalers. Marc Ashegian PSR ¶ 52; Michael Ashegian PSR ¶ 50. Instead, those records indicated that Maroon Pharmacy transferred over $3 million to FHC, and that FHC subsequently transferred funds to the individuals sourcing those drugs from FHC and Maroon. Marc Ashegian PSR ¶ 53; Michael Ashegian PSR ¶ 51. FHC retained approximately $200,000 in those funds during its time of operation, which occurred approximately between July 2015 and January 2015. Marc Ashegian PSR ¶ 54; Michael Ashegian PSR ¶ 52.

**b.     Sentencing Guideline Calculation and Guideline Range**

The Guidelines calculation for both Michael and Marc Asheghian is the same:

| | | |
|---|---|---|
| a. | Base Offense Level, U.S.S.G. § 2B1.1 | 6 |
| b. | Specific offense characteristics under U.S.S.G. Ch. 2 (Loss > $150,000, U.S.S.G. § 2B1.1(b)(1)(F)) | +10 |
| c. | Mitigating Role Adjustment (U.S.S.G. § 3B1.2) | -4 |
| d. | Acceptance of Responsibility: | - 2 |

d.     Acceptance of Responsibility:
If I meet the requirements of U.S.S.G. § 3E1.1, I may be entitled to a two -level reduction for acceptance of  responsibility, provided that I forthrightly admit my guilt, cooperate with the Court and the Probation Office in any presentence investigation ordered by the Court, and continue to manifest an acceptance of

1    responsibility through and including the time of sentencing.

2    e.    Adjusted Offense Level:                                                10

3    With a criminal history category of I, an adjusted offense level of 10 results in a Guidelines

4    range of 6 to 12 months.

5    **c.    JSIN data reflecting sentencing information for similarly situated
      defendants**

6

7    During the last five fiscal years (FY2017-2021), there were 1471 defendants whose primary

8    guideline was §2B1.1, with a Final Offense Level of 10 and a Criminal History Category of I, after

9    excluding defendants who received a §5K1.1 substantial assistance departure. For the 460 defendants

10   (31%) who received a sentence of imprisonment in whole or in part, the average length of imprisonment

11   imposed was 6 month(s) and the median length of imprisonment imposed was 6 month(s).

12   **d.    Sentencing recommendation**

13   Marc and Michael Asheghian each pled guilty to one count in a Superseding Information,

14   charging them with Aiding and Abetting the Unlicensed Wholesale Distribution of Drugs, in violation of

15   21 U.S.C. §§ 331(t), 333(b)(1)(D), 353(e)(2)(A), and 18 U.S.C. § 2. Although the agreed upon

16   disposition renders a lower Guidelines range than some of their counterparts, their actions were serious

17   and undoubtedly played a role in the overall scheme. For these and the other reasons set forth herein, the

18   government recommends a sentence of six months in custody for both defendants.

19   **6. Artur Nazaryian**

20   **a.    Summary of Offense Conduct**

21   Nazaryian pled guilty to a Superseding Information charging Nazaryian with misdemeanor

22   prescription drug diversion (Introduction or Delivery for Introduction of Adulterated or Misbranded

23   Drugs, in violation of 21 U.S.C. §§ 331(a) and 333(a)(1)).

24   Nazaryian worked for defendant Arman Zargaryan at Nuvo Pharmaceuticals, which was an

25   entity that was used as a front to launder money and facilitate the unlicensed distribution of

26   pharmaceutical sales. Nazaryian's conduct included going to the bank at Zargaryan's direction and

27

28

1  withdrawing funds. Nazaryian's conduct included going to the bank and withdrawing money from the

2  company's bank accounts.

3  More specifically, there were several bank accounts for Nuvo Pharmaceuticals maintained under

4  the name "Ara Yeramyan," who was the only authorized signer. Bank surveillance stills show that

5  Nazaryian made large withdrawals from the Yeramyan-Nuvo Pharmaceuticals accounts, effectively

6  liquidating several million dollars in one account and, in just January 2015 alone, withdrawing or

7  spending $745,000 from another account.

8  The FBI obtained a search warrant for an e-mail address associated with Nuvo Pharmaceuticals.

9  These e-mails indicate that the address was used by Nazaryian for personal errands, such as online

10  shopping, booking a ride for a car service, and paying for trips to New York, was also used for Nuvo

11  Pharmaceuticals business, namely offering drugs for sale to Maroon Pharmacy.

12  ### b.    Sentencing Guideline Calculation and Guideline Range

13  Nazaryian has no prior criminal history. Nazaryian's guidelines range is 0-6 months.

14
15  ### c.    JSIN data reflecting sentencing information for similarly situated defendants

16  During the last five fiscal years (FY2017-2021), there were 83 defendants whose primary

17  guideline was §2N2.1, with a Final Offense Level of 4 and a Criminal History Category of I, after

18  excluding defendants who received a §5K1.1 substantial assistance departure. For the 7 defendants (8%)

19  who received a sentence of imprisonment in whole or in part, the average length of imprisonment

20  imposed was 6 month(s) and the median length of imprisonment imposed was 3 month(s). For all 83

21  defendants in the cell, the average sentence imposed was 1 month(s) and the median sentence imposed

22  was 0 month(s).

23  ### d.    Sentencing recommendation

24  The government agrees that a sentence of probation is appropriate for Barndt and Nazaryian.

25  Barndt and Nazaryian are the least culpable of this group of defendants as their roles were limited to

26  ministerial work, such as helping others fill blank spots in pedigrees that communicated false

27  information and withdrawing cash from bank accounts. Although Barndt and Nazaryian held roles that

28
U.S. SENTENCING MEMORANDUM (PRESCRIPTION DRUG DIVERSION DEFENDANTS)
15-0234 CRB

furthered the criminal activities of others, their work did not meaningfully contribute to developing

pipelines of diverted drugs or creating ways to launder the proceeds of drug diversion. Moreover, given

their limited criminal histories and compliance with all Pretrial Service's directives to date, a sentence of

probation is sufficient, but no more than necessary, to reflect the seriousness of Barndt's and

Nazaryian's offenses in light of their circumstances, characteristics, and acceptance of responsibility for

their actions.

### 7.  Cheryl Barndt

#### a.   Summary of Offense Conduct

Barndt pled guilty to a Superseding Information charging her with misdemeanor prescription

drug diversion (Introduction or Delivery for Introduction of Adulterated or Misbranded Drugs, in

violation of 21 U.S.C. §§ 331(a) and 333(a)(1)).

Barndt worked for defendant Alexander Soliman, who owned and controlled several businesses

engaged in the wholesale distribution of drugs, including Apex Pharmaceuticals and Maroon Pharma.

Barndt worked for Soliman at both Apex Pharmaceuticals and Maroon Pharma.  Barndt first met

Soliman through a mutual business associate and began working with him and his wife as a part-time

nanny for the family. Over time, she started helping them with miscellaneous bookkeeping tasks.

Eventually, Soliman hired her to work at his businesses where she performed a number of tasks at his

direction and under his supervision. Soliman would give Barndt pre-filled drug pedigrees and directed

her how to fill out the blanks and completed other paperwork at Soliman's direction. Barndt dealt more

directly with customers and sent them pedigrees containing false information.

#### b.   Sentencing Guideline Calculation and Guideline Range

Barndt has no prior criminal history. Barndt's guidelines range is 0-6 months.

#### c.   JSIN data reflecting sentencing information for similarly situated defendants

During the last five fiscal years (FY2017-2021), there were 83 defendants whose primary

guideline was §2N2.1, with a Final Offense Level of 4 and a Criminal History Category of I, after

excluding defendants who received a §5K1.1 substantial assistance departure. For the 7 defendants (8%)

who received a sentence of imprisonment in whole or in part, the average length of imprisonment imposed was 6 month(s) and the median length of imprisonment imposed was 3 month(s). For all 83 defendants in the cell, the average sentence imposed was 1 month(s) and the median sentence imposed was 0 month(s).

### d.   Sentencing recommendation

The government concurs with Probation's sentencing recommendation as to defendant Barndt of one year probation.

### E.   Relative Culpability of the Defendants in this Group

The 38 defendants charged in this case all fall across a broad spectrum of culpability. Specifically, as it relates to the prescription drug diversion defendants discussed herein, defendants Mihran and Artur Stepanyan (collectively, "the Stepanyans") are, in the government's view, two of the most culpable defendants in this case. Their conduct was systematic, egregious, and massive in scale. The only other defendant that compares to the Stepanyans in terms of culpability is David Miller, who was convicted in January of 2023 of fourteen counts—RICO conspiracy, conspiracy to commit mail/wire fraud, mail fraud, money laundering conspiracy, and conspiracy to commit unlicensed wholesale distribution of prescription drugs and false statements—following a two-week jury trial. The evidence was so overwhelming that the jury returned a guilty verdict on all 14 counts (in addition to the counts against the corporate co-defendant, Minnesota Independent Cooperative) after deliberating for less than 3 hours. Much of the evidence against Miller is equally incriminatory against the Stepanyans. In general terms, Miller's and the Stepanyans' heightened culpability is due in part to the degree of their involvement in and oversight of various schemes and the large amount of money involved in their criminal activities.

Arman Zargaryan is also considered to be significantly more culpable than other defendants in the case. This is due in part to the degree of his involvement in and oversight of various schemes and the large amount of money involved in his criminal activities.

Then, there is a swath of defendants that fall in the middle of the culpability spectrum. Of those, Yan German ranks at the higher end with respect to his relative culpability. This is because he provided

1   large quantities of prescription drugs to the Stepanyans for two years. In addition, his fingerprints were

2   found on a sham contract used by Ara Karapedyan and the undercover agent (UC) to facilitate the

3   laundering of approximately $1.2 million worth of proceeds of the Stepanyans' and Miller's prescription

4   drug diversion scheme. The same factors counsel in favor of a Guidelines sentence for German and

5   Zargaryan. Both German and Zargaryan provided services to the Stepanyans that furthered their

6   respective efforts to sell diverted drugs to an unwitting public. Although the Stepanyans' culpability is

7   much greater, German's and Zargaryan's conduct was crucial to the overall scheme and the Stepanyans'

8   long-term success. German provided a reliable, and sizeable, source of diverted drugs to the Stepanyans

9   and assisted them with laundering the proceeds of their criminal activity. To that end, German provided

10  a crucial link between the Stepanyans and Karapedyan, including the cashing of checks and the signing

11  of false agreements meant to conceal the true nature of the Stepanyans' business. The seriousness of this

12  criminal activity and the need to deter both German and others from supporting these schemes indicates

13  that a Guidelines sentence is appropriate, and is what is sufficient, but not more than necessary, to

14  advance the goals set forth in Title 18, United States Code, Section 3553

15      Zargaryan was crucial in ensuring the success of ME Wholesale, whether by procuring diverted

16  drugs for sale to its various customers or enacting the Stepanyans' own measures to prevent detection.

17  Like the Stepanyans did with their various shell companies, Zargaryan obtained a company of his own

18  from Arman Danielian to establish a patina of legitimacy over an enterprise that obtained drugs from the

19  streets and concealed that fact to patients seeking life-saving medications. Like the Stepanyans and

20  Miller, Zargaryan created pedigrees to further the lies that would be fed to pharmacies and patients once

21  they received medications that Zargaryan and others obtained from the streets. But unlike the

22  Stepanyans, Zargaryan went further and became party to a bank fraud scheme involving stolen checks.

23  Although this activity is unrelated to the drug diversion scheme, it demonstrates the need for a

24  Guidelines sentence. Zargaryan was, apparently, in need of additional income apart from the $24 million

25  he derived from his participation in the Enterprise. A Guidelines sentence would ensure that Zargaryan,

26  and others, will be adequately deterred from searching for another fraud or scheme to make money at the

27  expense of anyone capable of providing it, whether pharmacies, patients, banking customers, or anyone

28

1  in between.

2      Loui Artin, Michael Asheghian, and Marc Asheghian similarly fall in the middle swath in terms

3  of culpability, but at the lower end. The Ashegians both pled guilty to Aiding and Abetting the

4  Unlicensed Wholesale Distribution of Drugs, in violation Title 21, United States Code, Sections 331(t),

5  333(b)(1)(D), 353(e)(2)(A), and Title 18, United States Code, Section 2.

6      Although each of these defendants was actively and knowingly involved in the schemes, the

7  scale of their conduct was smaller yet not insignificant.

8      On the opposite side of the spectrum are the least culpable defendants. Those individuals

9  generally consisted of business assistants or individuals who acted at the direction of others who were in

10  positions of authority, and/or individuals whose charged criminal activity was minimal or tangential.

11  Defendants Cheryl Barndt and Artur Nazaryian are among the least culpable defendants in this case.

12  They both pled guilty to a misdemeanor count, specifically, Introduction and Delivery for Introduction

13  of Adulterated and Misbranded Drugs, in violation of Title 21, United States Code, Sections 331(a) and

14  333(a)(1). Barndt was an employee of Apex Pharmaceuticals and Maroon Pharma, referenced above.

15  Barndt PSR ¶¶ 45-46. Barndt conducted various tasks for Apex Pharmaceuticals and Maroon Pharma,

16  including bookkeeping and working with customers. Barndt PSR ¶ 47. Barndt also helped her manager

17  at Apex Pharmaceuticals and Maroon Pharma with filling out pedigrees. She was given pre-filled

18  pedigrees with certain blank areas and was told how to complete the forms. *Id.* Similar to Barndt,

19  Nazaryian worked for Zargaryan at Nuvo Pharmaceuticals in an administrative capacity. Nazaryian PSR

20  ¶ 59. Among other thing, Nazaryian went to the bank and withdrew funds from accounts in the of Nuvo

21  Pharmaceuticals, which themselves were held in the name "Ara Yeramyan." Nazaryian PSR ¶ 60.

22  Nazaryian did so at the direction of Zargaryan. Nazaryian PSR ¶ 62.

23      **F.    Comparative Offense Levels**

24      The government agrees with U.S. Probation's calculations as to the defendants' respective

25  Adjusted Offense Levels and Criminal History Categories as set forth below:

26
27
28

| Defendant | Adjusted Offense Level | Criminal History Category | Applicable Guidelines Range |
|---|---|---|---|
| Mihran Stepanyan | 30 | III | 121-151 mo. |

| | | | |
|---|---|---|---|
| Artur Stepanyan | 30 | II | 108-135  mo. |
| Yan German | 24 | I | 51-63 mo. |
| Arman Zargaryan | 26 | III | 78-97 mo. |
| Loui Artin | 16 | II | 24-30 mo. |
| Marc Ashegian | 10 | I | 6-12 mo. |
| Michael Ashegian | 10 | I | 6-12 mo. |
| Artur Nazaryian | 4 | I | 0-6 mo. |
| Cheryl Barndt | 4 | I | 0-6 mo. |

## **CONCLUSION**

For the reasons set forth above, the United States respectfully requests that the Court impose the following sentences on the defendants:

| Defendant | Recommended Sentence |
|---|---|
| Mihran Stepanyan | 136 months' imprisonment |
| Artur Stepanyan | 122 months' imprisonment |
| Yan German | 51 months' imprisonment |
| Loui Artin | 27 months' imprisonment |
| Arman Zargaryan | 78 months' imprisonment |
| Marc Ashegian | 6 months' imprisonment |
| Michael Ashegian | 6 months' imprisonment |
| Artur Nazaryian | 1 year of probation |
| Cheryl Barndt | 1 year of probation |

U.S. SENTENCING MEMORANDUM (PRESCRIPTION DRUG DIVERSION DEFENDANTS)
15-0234 CRB

1   DATED:  March 1, 2023                    Respectfully submitted,

2                                            STEPHANIE M. HINDS
                                             United States Attorney
3

4                                            _____/s/_____

5                                            CLAUDIA A. QUIROZ
                                             ANDREW F. DAWSON
6                                            CHRIS KALTSAS
                                             Assistant United States Attorneys
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

U.S. SENTENCING MEMORANDUM (PRESCRIPTION DRUG DIVERSION DEFENDANTS)
15-0234 CRB
                                    30